We'll hear argument this morning in Case 22-915, United States v. Rahimi. General Prologar. Mr. Chief Justice, and may it please the Court. Guns and domestic abuse are a deadly combination. As this Court has said, all too often the only difference between a battered woman and a dead woman is the presence of a gun. Armed abusers also pose grave danger to police officers responding to domestic violence calls and to the public at large, as Zaki Rahimi's own conduct shows. To address that acute threat, Congress and 48 states and territories temporarily disarm individuals subject to domestic violence protective orders. Congress designed Section 922G8 to target the most dangerous domestic abusers. It applies only if, after notice in a hearing, a court makes an express finding that the person poses a credible threat to an intimate partner's physical safety or imposes a specific prohibition on the use of physical force. And the disarmament lasts only as long as the order remains in effect. The Fifth Circuit profoundly erred in reading this Court's decision in Bruin to prohibit that widespread, common-sense response to the deadly threat of armed domestic violence. Like Heller and McDonald, Bruin recognized that Congress may disarm those who are not law-abiding, responsible citizens. That principle is firmly grounded in the Second Amendment's history and tradition. Throughout our nation's history, legislatures have disarmed those who have committed serious criminal conduct or whose access to guns poses a danger. For example, loyalists, rebels, minors, individuals with mental illness, felons, and drug addicts. Brahimi offers no historical evidence that those laws were thought to violate the right to keep and bear arms or that the Second Amendment was originally understood to prevent legislatures from disarming dangerous individuals. Despite all that, the Fifth Circuit held that Section 922G8 is facially unconstitutional because the founding generation didn't disarm domestic abusers in particular. But Bruin specifically approved that kind of demand for a historical twin. The Fifth Circuit's approach departs from the Second Amendment's original meaning and would enact the very sort of regulatory straitjacket that this Court just claimed in Bruin. I welcome the Court's questions. General, would you just briefly define what you mean by law-abiding and responsible? Of course, Justice Thomas. So I would break that into its two constituent components. With respect to those who are not law-abiding, history and tradition shows that that's defined by those who have committed serious crimes, defined by the felony-level punishment that can attach to those crimes. This case focuses on the not-responsible-citizens principle, and in this context, we think that history and tradition show that it applies to those whose possession of firearms would pose an unusual danger beyond the ordinary citizen with respect to harm to themselves or harm to others. This is a civil action. I think we could agree on these were criminal proceedings. What if someone is categorized as irresponsible for not storing firearms properly? So I think that there would be a history and tradition to support the idea that if someone has improperly stored their firearms and thus demonstrated by their conduct that they're not fit to keep and bear arms, they would fit within this category of those who are not responsible, and there were a number of historical laws that operated that way. For example, those who had improperly stored gunpowder and caused the risk of explosions. Below, you had a list of classes of individuals who were excluded in your opening argument. Below, you included in that class or in those classes slaves and Native Americans. Why did you drop those classes? We haven't invoked those laws at this stage of the proceedings because we think that they speak to a distinct principle and the textual hook that at the particular point in time, those categories of people were viewed as being not among the people protected by the Second Amendment in the first instance. Obviously, that was an odious classification, but those laws were generally accompanied by stripping of other political rights or ability to participate in the political community, and we think they were justified at that time on that basis. And so the reason we haven't invoked them here is because we focused on the more directly relevant laws that apply to those who are indisputably among the people, but nevertheless fit within this enduring constitutional principle that the legislature has authority to draw lines and make predictive judgments about those whose access to firearms will create that untenable risk of danger. Is someone who drives 30 miles an hour in a 25-mile-an-hour zone, does that person qualify as law-abiding or not? I think that that wouldn't qualify to the extent that it's classified as a misdemeanor or minor criminal conduct under state law, and I do want to be clear that we certainly think that wouldn't apply under the not responsible category, but if you're focusing on law-abiding in particular, we think that history and tradition there support the conclusion that you can disarm those who have committed serious crimes. So it's not just that any kind of conduct that is an offense would qualify. Are you making a misdemeanor felony distinction? That's the line that history and tradition reflect, and so yes, I think that that is the relevant category with respect to law-abiding citizens. But again, I would just emphasize here we're not directly invoking the law-abiding aspect of the principle because Mr. Rahimi didn't have the kind of criminal record that would justify disarmament on that basis. Instead, our arguments here are directed at the aspect of the standard focused on those who are not responsible. Responsibility is a very broad concept. I mean, not taking your recycling to the curb on Thursdays. I mean, if it's a serious problem, it's irresponsible. Setting a bad example, you know, like yelling at a basketball game in a particular way, it seems to me that the problem with responsibility is that it's extremely broad, and what seems irresponsible to some people might seem like, well, that's not a big deal to others. So what is the model? I mean, do you go back to what was irresponsible at the common law, or let's take a poll and see if people think it's irresponsible, you know, to get into a fistfight at a, you know, sports event where tempers were running high, or what? So I want to be really clear that we're not using the term not responsible to describe colloquially anyone who you might describe as demonstrating irresponsibility in many of those contexts that you just described in your hypotheticals. Instead, we read this court's case law, and in particular, it's articulation of that principle. We're tracking the court's language here, the principle of responsibility, as being intrinsically tied to the danger you would present if you have access to firearms. And I would draw a parallel here to the principles the court has articulated with respect to sensitive places or with dangerous and unusual weapons in each of these categories. Just to be clear, you're using responsible as a placeholder for dangerous with respect to the use of firearms? Correct. So that's how we understand history and tradition in this context. And the reason that we've used the term not responsible is because it's the standard that this court itself has articulated in Heller and repeated in McDonald and then repeated again in Bruin. I think probably the reason the court has used the term not responsible is it gets at the idea that some of the categories of people who can be disarmed might not intend to be dangerous. They might not be culpable in that sense, like the mentally ill or minors. And so I think responsibility gets at the idea that they might not actually intend to be a danger, but in fact would present the danger if they had firearms. So there's no daylight at all then between not responsible and dangerous? Yes. With respect to responsibility in particular, our understanding of what history and tradition reflect and how this court has used the term is that it's identifying those whose possession of firearms presents an unusual danger beyond the ordinary citizen. And again, I would draw the analogy to sensitive places and to dangerous and unusual weapons. In each of these contexts, the court is trying to identify those arms that are especially dangerous, those places where carrying weapons will pose unique dangers, and those categories of people who beyond the ordinary citizen possess a particular danger if they have access to firearms. So it's not a synonym for virtue? No, we're not invoking that. You're not throwing in the virtuous citizenry? We are not, no. We think that here there is a direct link under the responsible citizen's principle to danger, and we think that the disarmament provision I'm defending here, section 922G8, clearly satisfies that link because it requires individualized findings of dangerousness and a legislative consensus that individuals in this category present the requisite level of danger. Well, and how do you know? I mean, I think there would be little dispute that someone who was guilty, say, or even had a restraining order, that domestic violence is dangerous. Okay. So someone who poses a risk of domestic violence is dangerous. How does the government go about showing whether certain behavior qualifies as dangerous? Because this might be in a heartland, but then you can imagine more marginal cases. So you've invoked the consensus among the states, tradition of dangerousness, and I don't think you'd get a lot of pushback because this is violence, after all, domestic violence. What about more marginal cases? So I think that the factors we think courts could apply in this context, and I should emphasize that this is subject to meaningful judicial review, would fall into a couple of different categories. At the outset, I would take the class of disarmament provisions that require individualized findings of dangerousness and say those fall in the heartland, as you just suggested. We have a judicial order here that specifically found that Mr. Rahimi's conduct was dangerous to his intimate partner. Then I think you get to the category of cases where a legislature might be making categorical predictive judgments that individuals with a certain characteristic or quality or past conduct present a danger, and those, I think, can be harder cases. But the factors I would point to first would be the breadth of the law, because we know that the Second Amendment was intended to prevent disarming wide swaths of the American public. So if it's sweeping broadly or indiscriminately and capturing people we think of as ordinary citizens, that's going to be a problem. Next, I would look at the justifications and the evidence before the legislature. This would operate like sensitive places. You could look and see, is that place, in fact, dangerous if there are weapons there? So, too, you could look at the evidence the legislature was consulting with respect to its judgment of dangerousness. And then the third factor would be that legislative consensus, and I don't want to suggest that this is dispositive either way, because some legislatures can be the first mover, and if multiple legislatures enact an unconstitutional law, that doesn't give you a safe harbor. But I do think that legislatures are best positioned to make these kinds of predictive judgments about dangerousness, and if you have the kind of consensus that we see here with respect to Section 922G8, that's entitled to a lot of weight in the analysis. And I don't want to say, Justice Barrett, that this is always going to be easy and that these factors will cash out in obvious ways. I would say that I think that this is not a close case and that Section 922G8 is clearly constitutional and fits within the category of disarming irresponsible citizens under these principles. Can I ask you a question about that, though? I guess I'm trying to understand whether we can really be analyzing this consistent with the Bruin test at the level of generality of dangerousness. I wonder whether we need to be taking into account how historically domestic violence in particular was treated so that if we had evidence that men who engaged in domestic violence historically were actually not perceived as then dangerous from the standpoint of disarmament, what would we do with that in this situation? So I don't think that historical attitudes about dangerousness would be controlling with respect to modern-day circumstances, and I would draw an analogy here to dangerous and unusual weapons. The court has recognized, for example, that handguns were not in common possession at the time of the founding and might have been considered unusual weapons then, but that's not what the court would look at for determining whether you could ban handguns today. But is that just because that's a new technology? I mean, the circumstance with respect to domestic violence clearly existed back in the day. And the question, I guess, I'm just trying to understand how the Bruin test works in a situation in which there is at least some evidence that domestic violence was not considered to be, you know, subject to the kinds of regulation that it is today. And so when we're looking under that test for historical analogs, I guess, you know, a series of regulations that relate to disarming dangerous people, I need to understand why that would be enough. Well, so let me try to respond to the methodological point, and then I want to respond to the specific questions you've raised about how domestic violence was treated at the founding and today. On the methodological point, I don't think that you could read Bruin to suggest that we need regulations that specifically disarm domestic abusers, because that would be coming dangerously close to imposing on the government the requirement for an identical twin of a regulation. And, of course, original meaning isn't dictated by the happenstance of whether there was a law on the books in 1791 that happened to disarm domestic abusers. I think you have to come up a level of generality and use history and tradition to help identify and discern the enduring constitutional principles that define and delimit the scope of the Second Amendment of life. What if we had a hypothetical in which we actually determined, based on the historical record, that domestic violence was not considered dangerousness back in the day? I mean, I just don't know what we'd do with that scenario. So I think in that scenario, you would recognize that it is consistent with the Second Amendment's original and enduring meaning that you can disarm dangerous people, and the conception of what regulations that permits today is not controlled by founding-era applications of the principles. And what's the point of going to the founding era? I mean, I thought it was doing some work, but if we're still applying modern sensibilities, I don't really understand the historical framing. The work that history and tradition are doing is helping to discern those principles in the first place. The idea, for example, that you can ban firearms in sensitive places. The fact is that the framers didn't ban firearms in schools, even though they existed at the founding, but the court has already recognized that those analogs and the historic banning of firearms in places where they present safety concerns can justify a modern-day regulation that does require the banning of weapons in schools. And so to here, I think the court can identify the constitutional principle, which it's already articulated. We're not asking the court to break new ground here and say, today, Section 922G8 is a clear application of that principle, that you can disarm dangerous people. And Justice Jackson, I do want to push back on the idea and the premise of your question that there was evidence at the founding, for example, that you couldn't disarm domestic abusers. It's true that the founders didn't do that, but there's no evidence to suggest that they would have thought that that crossed a constitutional line. And the fact that domestic violence was subject to a very different legal and societal regime at the time and was not viewed as the kind of system that warrants systematic governmental interference, I think can't be held against us now that we're looking at how Congress is reacting to the profound threats that armed domestic violence presents. General, one provision, one section of the provision at issue here, applies when a court order includes a finding that the person represents a credible threat to the physical safety of such intimate partner or child. But another provision applies when the order, by its terms, explicitly prohibits the use, attempted use, or threatened use of physical force. That does not require a finding of dangerousness. Why is that necessary and how can that be justified? I think ultimately a court would have to find dangerousness to enter a subparagraph C2 injunction based on the general equitable principle that in order to enjoin conduct, you have to think that conduct is reasonably likely to occur. This is a universal equitable principle. It certainly applies in Texas and in virtually all of the states. And I think what it means is that a judge who's considering a request for a protective order wouldn't have a basis in law to enter that subparagraph C2 prohibition on the use of physical force unless the judge thought the force was sufficiently likely to materialize. Well, we are told in some of the amicus briefs that there are situations in which the family court judge who has to act quickly and may not have any investigative resources faces a he-said-she-said situation and the judge just says, well, I'm going to issue an order like this against both of the parties. Do you agree that that occurs? No, I think that that is largely a mischaracterization of what is happening in the state courts day in and day out. With respect to mutual protective orders in particular, the vast majority of states, we cite a source that counts 48 of them, either prohibit outright or substantially restrict the entry of those kinds of mutual protective orders. And then I think the account is basically trying to suggest or insinuate that these state courts are nevertheless entering protective orders that are not justified by the facts and the law. And that just flies in the face of the presumption of regularity that this court applies in this context. Even the data on the ground don't bear out the assertions that family courts are just reflexively entering these kinds of protective orders. By respondents' own count, in the particular Tarrant County statistics he collected, there were 522 requests for protective orders, but that only resulted in 289 final protective orders. So I think even as a statistical matter, it's incorrect to say that invariably these orders are being entered without any basis in fact or law to justify them. Is there anything that a person who is subject to one of these orders can do if the person claims that there wasn't really sufficient notice or that due process rights were violated in some way or that any need for the protective order has expired? Presumably the person could go back to the state court that entered the order, but if the state court is completely unreceptive to that, is there any other avenue for relief? So I think it's important to parse out different aspects of the question. Certainly in a Section 922G8 prosecution, an individual could challenge the adequacy of the notice or the hearing. And so if the argument is I didn't actually receive the notice or I didn't have an opportunity to participate, that would be a defense because Section 922G8 requires that. Yes, but before the fact, so the person thinks that he or she is in danger and wants to have a firearm. Is the person's only recourse to possess the firearm and take their chances if they get prosecuted? No, I mean, I think the person would obviously have an ability to, within the state court system, challenge the entry of the protective order. But I don't think there would be any basis to say you could collaterally challenge that in the federal prosecution. And ultimately, this just reflects the history and tradition demonstrating that there are certain categories of people where we don't have to tolerate the risks of armed domestic violence that they would present, even in situations where they might claim that they need to have a gun for other reasons. There's no recourse before the fact in federal court. So I think that they could seek recourse in the state courts themselves. They could protest the notice and the opportunity for a hearing. But if a court has entered a protective order that complies with the restrictions in 922G8, then a federal court can rely on that in enforcing this prohibition. Is there any possibility of administrative relief? I think that at the state level, there are certain mechanisms in place where people can seek relief. And one important thing to emphasize is that these protective orders are inherently time-limited. It varies a little bit at the state level. I've seen provisions that authorize the imposition of these protective orders for six months up to about five years. I think most commonly they're in effect for just one year. But, you know, and the federal firearms prohibition tracks the length and duration of the protective order. So that also, I think, means that the disarmament lasts only so long if the danger is in effect. Well, one more question. The Alameda County Public Defender's Amicus Brief says that some restraining orders are permanent. Is that true? And if that is true, how do you justify a permanent prohibition, even if any danger has disappeared? So I'm not aware of state law authority that authorizes or that routinely enters permanent protective orders. As I mentioned, this varies across state law, so I don't want to suggest that there's a universal answer here. But these orders are generally time-limited or provide mechanisms for courts to go back and review the finding of dangerousness for purposes of effectuating the basic command of the protective order. Thank you. Just to be clear, none of the situations that Justice Alito is pointing to are the facts of this case, correct? They're the facts of this statute. That's right. And the constitutionality of this statute is what's at issue. Yes, and that this circuit invalidated the statute on its face. I do want to suggest that to the extent the court has been left with the impression in some of these Amicus Briefs that the protective orders are routinely entered without a basis to conclude that someone actually presents the individualized finding of danger, I do not think there is any record or evidence to support that conclusion here. And I would say again, this runs counter to the presumption of regularity that the court ordinarily affords in this context, but I think it also runs counter to Congress's recognition and circumscribing of Section 922G8 to ensure that it's covering those who had notice and an opportunity for a hearing, and therefore... Counsel, in the end, if there are due process failures in any system, that'll be subject to a separate challenge, correct? That's correct. And Mr. Rahimi hasn't made a due process claim here. He's not challenging Section 922G8 on that independent... I'd like to go back to your law-abiding or responsible citizen category. I now understand why you think it's appropriate. You think dangerous is too limited because we have restrictions on the age of people possessing firearms and on the mentally ill. And they're not... Why do you... And I understand they're not necessarily dangerous, but I guess their lack of responsibility or judgment could be questioned, correct? What I would say is we think that they are inherently dangerous, even though they might not be culpable or intending to create that kind of danger with firearms, that there's an inherent risk based on their qualities or characteristics that demonstrates that, as compared to the ordinary citizen, allowing them access to firearms is going to present that risk of danger to self or others. So if we use danger in the way you're defining it, as broadly as you're defining it, you don't need responsible citizen category? Yes, I think these are essentially getting at the same concept. I guess what I would say, Justice Sotomayor, is that we have tracked the court's own language here. And I think it would be important, if the court wants to refer to concepts of dangerousness, to make clear that it's not backtracking from what it said in Heller and in McDonald and in Bruin, that you can disarm those who are not law-abiding responsible citizens with the mentally ill as one of the exemplar categories the court held up to illustrate that proposition. And I think that the term responsible gets at the broader group of people who can be disarmed, even though they might not be culpable, precisely because of this risk of danger. Thank you, Counselor. Can you finish that answer? I was going to say, but if the court were to refer to these concepts of dangerousness, I just think it would be important to make clear that it's not backtracking from what it has said in prior cases. And it's not just that the court has referred to this concept in the abstract. It's actually embedded it in various aspects of how Second Amendment analysis operates. So, for example, the court has said background checks are okay because they're intended to decide whether you're the kind of ordinary law-abiding responsible citizen in the first place, or that when you're looking at whether a weapon is dangerous and unusual, you should ask, is this the kind of weapon that a law-abiding responsible citizen would need for self-defense? And so I just think there's a risk of creating confusion about that. Thank you, Counsel. I guess to get back to the beginning, so why did you use the term responsible if what you meant was dangerous? I mean, responsible presents all sorts of problems, and dangerous is sort of a different set of considerations. I mean, if you thought that our prior precedents were talking about dangerous, it's a little confusing to all of a sudden find responsible being the operative term. Well, we relied on the same phrasing the court itself used when it first articulated this constitutional principle in Heller, and so I think we were trying to point out that the court itself has already recognized the category of regulation that's consistent with original meaning under the Second Amendment, and we just followed the court's leading using that phrase, those who are not law-abiding responsible citizens. Well, but just to be clear, your argument today is that it doesn't apply to people who present the threat of dangerousness. Whether you want to characterize them as responsible or irresponsible, whatever, the test that you're asking us to adopt turns on dangerousness. Correct for those who are not responsible citizens. I do want to be clear that we think there are different principles that apply to those who are not law-abiding. So I just want to be clear, we don't think dangerousness is necessarily the standard there, although there's obviously going to be a lot of overlap. That's defined by its own history and tradition, but we do think that dangerousness defines the category of those who are not responsible. Thank you. Justice Thomas? If this were a criminal proceeding, then you would have a determination of what you're talking about. Someone would be convicted of a crime, a felony, assault or something. But here you have something that's anticipatory or predictive where a court, a civil court, is making the determination. Just from an analytical standpoint, would there be a difference between a criminal determination and a civil determination? So I don't think that it would make a difference with respect to whether the legislature can create categories of people who are considered dangerous or not responsible, and that's very much informed by history and tradition here. It is not the case that the only disarmament provisions that have existed over time targeting those who are dangerous are provisions that focus on those with criminal convictions. That is, of course, an important component of the law-abiding standard in particular, but we have a number of examples from throughout history of those who were disarmed even after civil adjudications or a civil-like process. Could you give me an example? Sure. So, for example, mental illness. This was the category that Heller held up as the quintessential example of those who aren't responsible, even though mental illness in our legal system has always been adjudicated through civil proceedings. That was true, for example, of loyalists. The disarmament provisions on loyalists were enforced through those who were refusing to take a loyalty oath, and so there wasn't any necessity of a criminal conviction. So, too, with those who were intoxicated. You didn't need to show that they had actually been criminally convicted in order to disarm them. So I think that there is a long-standing tradition here of recognizing that individuals can be determined through this predictive judgment to be dangerous even in the absence of a criminal conviction. Just one last question. This is a judicial determination here. Would you be able to make the same arguments if it had been an administrative determination? I think it would be far more difficult to defend an executive branch or administrative determination because of a separate Second Amendment principle that guards against granting executive officials too much discretion to decide who and who cannot have firearms. There was some history about that in England, of course, but in the American legal tradition, these principles have been deployed through legislative judgments or through expressed judicial findings of dangerousness. So I don't think that we could point to the same history and tradition of giving executive branch officials that discretion. Justice Alito? Suppose that a jurisdiction enacted a concealed carry permitting regulation that is almost identical to the one we invalidated in Bruin, except that it requires an applicant to show that he or she is sufficiently responsible. Would that be constitutional? So if that were implemented through a system of executive discretion, just as I was discussing with Justice Thomas, I think that there could be additional principles that come into play that would guard against that kind of licensing regime. Now, to the extent that that kind of background system was intended just to implement the bases for disarmament that reflect legislative judgments, in other words, to check for whether you have a history of commitment to a mental institution or a criminal record or so forth, then I think those objective standards could be deployed as part of a background check system, and Bruin specifically suggested as much. One more question. In response to my question about the provision that prohibits the possession of a firearm by someone against whom an order prohibiting violence has been entered, and the provision doesn't on its face require a finding of dangerousness, I recall your answer was that state laws generally do require that and anyway equitable principles require that. Now, suppose someone is later prosecuted for violating that provision. Would it be a defense for that person to say that the state law in question did not require such a finding, and in fact there was no such finding in my case? I don't think that that would provide a basis to collaterally challenge the entry of the protective order in the federal prosecution, and we don't think that there should be a system of as-applied challenges in this context because I think that what we know is that Congress is entitled to make categorical judgments, predictive judgments of dangerousness based on history and tradition, even if there are really edge cases where that predictive judgment wasn't actually necessary to guard against the danger there. But if what you're suggesting is that there might be a state out there that is ordering judges to enter the subparagraph C2 prohibition without any basis to think that physical force is likely, I think a person would have a very strong due process challenge to that kind of law, and that law would likely be invalidated on the separate basis that it doesn't provide due process if it's requiring courts to enter relief that the facts in the law don't support. Justice Sotomayor? Justice Kagan? General, there seems to be a fair bit of division and a fair bit of confusion about what Bruin means and what Bruin requires in the lower courts, and I'm wondering if you think that there's any useful guidance in addition to resolving this case, but any useful guidance we can give to lower courts about the methodology that Bruin requires be used and how that applies to cases even outside of this one? Yes, I think that there are three fundamental errors in methodology that this case exemplifies and that we are seeing repeated in other lower courts, and that this case provides an opportunity for the court to clarify that Bruin should not be interpreted in the way that Respondent is suggesting. The first error we see is that Respondent has asserted here and other courts have embraced the idea that the only thing that matters under Bruin is regulation. In other words, you can't look at all of the other sources of history that usually bear on original meaning. And I don't think that that can be squared with this court's precedent, starting with Heller, which consulted a wide variety of historical sources, the same kind of evidence we've come forward with here about English practice, state constitutional precursors, treatises, commentary, state judicial decisions. All of that is relevant evidence about the scope of the Second Amendment right, and I think the court could make clear that it's not a regulation-only test. Second, I think that looking just at regulations themselves, one of the fundamental problems with how courts are applying Bruin is the level of generality at which they're parsing the historical evidence. Court after court has looked at the government's examples and picked them apart to say, well, taking them one by one, there's a minute difference between how this regulation operated in 1791 or the ensuing decades and how Section 922 provisions operate today. And I think that comes very close to requiring us to have a dead ringer when Bruin itself said that's not necessary. The way constitutional interpretation usually proceeds is to use history and regulation to identify principles, the enduring principles that define the scope of the Second Amendment right. And so we think that you should make clear that courts should come up a level of generality and not nitpick the historical analogs that we're offering to that degree. And third and finally, I think that in many instances, courts are placing dispositive weight on the absence of regulation in a circumstance where there's no reason to think that that was due to constitutional concerns. So, for example, here we don't have a regulation disarming domestic abusers. But there is nothing on the other side of the interpretive question in this case to suggest that anyone thought you couldn't disarm domestic abusers or couldn't disarm dangerous people. And in that kind of context, I think to suggest that the absence of regulation bears substantially on the meaning of the Second Amendment is to take a wrong turn. It's contrary to the situation the court confronted in Bruin where there was a lot of historical evidence to say states can't completely prohibit public carry. And against that evidence, you might say that the absence of regulation is significant. But here there's nothing on the other side of this interpretive question, and I think that that just shows that you shouldn't hold the absence of a direct regulation against us. Thank you. Justice Gorsuch? Good morning, General. I want to follow up on your response to Justice Kagan, I think your second response, the level of generality question. Do you think the level of generality, I take your point, you've got surety laws, you've got affray laws, you've got a lot of historical evidence, maybe not the historical twin. And you're saying we should overlook that. In the same way, I think you would say, I want to make sure you'd say, the analysis also applies similarly to the right side of the ledger, the regulation side and the right side. We're not looking for, is it a fowler or is it a musket? Is that a fair understanding of how you see the law? Yes, we think that it applies in both directions, both in understanding the right itself and in understanding the limitations that are built into that right. And you had a discussion about the length of time that some of these orders last, and you emphasized that you're only arguing for a temporary dispossession. And I guess I'm wondering, on a facial challenge, do we need to get into any of that, right? Normally we ask on a facial challenge, is there any set of circumstances in which the dispossession would be lawful? And there may be an as applied if it's a lifetime ban that would come to us, and that would be a separate question. Is that how you see it too? I agree that that would be a separate question, yes. I think that there is good reason to reject as applied challenges if and when they come before the court because of the categorical judgments that we think history and tradition support, but I acknowledge that here it's only a facial challenge. And along the same lines on the facial challenge aspect of it, do we need to resolve C-2? And the question that Justice Alito was asking, given that the defendant is a plaintiff before us, the respondent, sorry, has been adjudicated under C-1, and we actually have a finding of a credible threat. The dangerousness argument seems most apparent there, and we don't know much about how all states administer C-2 regimes. So I agree that this is a facial challenge, and the court could confine its analysis to C-1. I guess I would make just two responses to that. One is to say that I think it's going to be difficult for the court to avoid the C-2 issue. We ourselves have a pending petition where the Fifth Circuit has invalidated an application of the statute in a C-2 context. So unless you want to see me here again next term on this issue... Always delighted to see you, Tamara. The issue has been fully briefed, and we think it's an important part of the statute. But the second thing I would say is that even if you wanted to confine your analysis to C-1, I do think that at the very least you would have to reject some of the key premises of respondents' arguments in this case, and that relates to the colloquy I had with Justice Kagan. For example, the level of generality in which he's parsing the regulations, the fact that we don't have a domestic violence example in particular, his arguments that legislatures just can't disarm anybody, that persons can't be disarmed, that kind of thing. I've followed all of that. Gotcha. And the same thing goes with due process. We don't have a due process challenge before us, and so we don't need to resolve any of that either. That's correct. He did not make a due process claim here. And then lastly, some lower courts have recognized a duress defense to 922 charges. You know, someone's invaded their home, and they use a gun that they have illegally in self-defense. What's the government's view on that? So, you know, I want to be careful here because I haven't actually reviewed the cases that you must be referring to where those offenses have been made. I would have to take a look at those to provide you with a well-thought-out government view on that issue. Obviously, we recognize that there are distinctive legal doctrines like necessity and defense that can come into play, and so I'm sorry that I don't have a... What would you counsel us to do about them? I know it's not fair standing before you not having reviewed them, but there are these historical common law defenses of necessity and duress when it's not aimed at the subject of the protective order but a home invasion, for example. So I would urge the court not to say anything about those doctrines here where we've got a facial challenge and where certainly Mr. Rahimi isn't making that kind of defense to a Section 922G8 conviction. I would save for another day how the court might think about those issues where they're squarely presented. Thank you very much. Justice Kavanaugh? Just to follow up on your colloquies with the Chief Justice and Justice Sotomayor, I just want to make sure I have the terminology exactly correct as you see it. One category you think the government can prohibit possession by those who are not law-abiding, and you said that encompasses serious offenses. Is that correct? That's correct, which we would define by felony-level punishment. Okay. And the second is the government can prohibit possession by those who are not responsible, and by that you mean those who are dangerous. Is that correct? Yes, those whose possession of firearms would present a danger to themselves or others, but they don't have to be intentionally dangerous, which gets at the culpability question. Good. Thank you. Justice Barrett? My question is on the law-abiding and responsible also. I guess I understood our use of that phrase in our prior cases to describe the would-be gun owners in those cases. Like, we're not talking about who might be able to be disarmed. There might be other people, but all of those people were law-abiding and responsible, and there was no allegation that they weren't.  The government is asking for that to be a test, but I don't think we presented it as a test. Do you see a reason for us to use that as the test, law-abiding and responsible, given some of the ambiguities in that phrase? So I wouldn't describe it as a test. I guess what I would do is describe it as the relevant category, the shorthand to get at the idea that legislatures, consistent with the Second Amendment, can take action to disarm particular types of people whose possession of weapons present these types of concerns, either that they have committed serious crimes or present a danger. And I would use this as shorthand in the same way the Court has referred to the sensitive places principle or the dangerous and unusual weapons principle. So could I just say it's dangerousness? Let's say that I agree with you that when you look back at surety laws and the fray laws, et cetera, that it shows that the legislature can make judgments to disarm people consistently with the Second Amendment based on dangerousness. Why can't I just say that? We certainly agree that that's what history and tradition show. We think that defines the scope of the category of those who are not responsible. We don't think dangerousness is the standard with law abiding, and I recognize you might have some different views on that, Justice Barrett. You don't need to resolve that issue here. This is a case just about someone who is not responsible in the form of being dangerous. So, yes, we would be happy with a decision that says legislatures for time immemorial throughout American history have been able to disarm those who are dangerous. But you're trying to save, like, the range issue. So you're not applying dangerousness to the crime. That's correct. We think that there are additional arguments that can be made to defend felon disarmament, and that those depend on the unique history and tradition with respect to criminal conduct. And so we would hope to have the opportunity to present those arguments and perhaps persuade you in a future case. Yes. Thank you. Justice Jackson? Just to clarify in response to what you just said to Justice Barrett, the determination of dangerousness would be evaluated based on what modern legislatures think counts as dangerous, because we're not bound to what qualified as dangerous back in the day. That's correct. We think that once the court recognizes the principle that history and tradition support this durable principle that you can disarm dangerous people, then the question becomes for any follow-on challenge whether the legislature, with respect to a particular category, has appropriately deemed these individuals dangerous and, therefore, fitting within that historical tradition. And I think the inquiry there would not be confined to how the founders thought about dangerousness. Instead, it would turn on some of the factors that I was discussing earlier with Justice Barrett about the breadth of the law, the evidence that supports the legislative judgment, and the consensus. The kinds of things we used to look at with the tiers of scrutiny, what's the justification for this? Is that what you're saying? No, I don't think that this is just a revival of some form of means and scrutiny, because we wouldn't be asking a court to balance the intrusion on the individual interest against the weight of the government's interest. Instead, this is about whether the legislature has properly classified a law as falling within the principle in the first place. And so it's not about balancing between those two different interests, but rather about looking at the legislature's predictive judgment of dangerousness and determining, ultimately, whether it's justified. All right, so let me just ask you about your first methodological error that you identified in response to Justice Kagan. You say that the courts are focusing too much just on regulation, legislation, and not on other indicia of what the historical tradition is. But when you were talking with Justice Thomas at the beginning, you seemed to suggest that the tradition with respect to slaves and Native Americans would not be subject to consideration for this. In other words, only the regulation as it relates to certain segments of society, I guess, count underneath this historic traditions test? Well, the reason we haven't invoked those other laws is because we think they were applications of a separate principle under the Second Amendment, which is that those who are not considered among the people can be disarmed. That, of course, has the textual hook, and the court in Heller defined that as those who are not part of the political community. And when we look at how those laws operated, they traditionally stripped the affected individuals from all rights to participate in the political community. I understand that, but where does that leave us with respect to the application of our test? I'm trying to understand if there's a flaw in the history and traditions kind of framework to the extent that when we're looking at history and tradition, we're not considering the history and tradition of all of the people, but only some of the people as per the government's articulation of the test. Well, I certainly think that those laws are a part of history. We don't think that they're a part of history that are directly relevant to the separate question at issue here. And so we've instead pointed to a variety of other laws that we think more clearly bear on the issue of when legislatures can disarm even those who are among the people. All right. And finally, let me just ask you perspectively from the standpoint of a legislator today. I mean, we've been talking about sort of the retrospective view of this. You know, when there's an existing gun control measure that's being challenged, how do we determine by looking at history whether or not it's constitutional? But let's say I'm a legislator today in Maine, for example, and I'm very concerned about what has happened in that community and my people, the constituents, are asking me to do something. Do you read Bruin as step one being go to the archives and try to determine whether or not there's some historical analog for the kinds of legislation that I'm considering? No. I think that Bruin requires a close look at history and tradition and analog to the extent they exist and are relevant for purposes of articulating the principle. But once you have the principle locked in, and here the principle would be you can disarm those who are not responsible or dangerous, however the court wants to phrase it, then I don't think it's necessary to effectively repeat that same historical analogical analysis for purposes of determining whether a modern-day legislature's disarmament provision fits within the category. Instead, I think you would look at the factors I was articulating earlier in response to Justice Barrett's question about the evidence before the legislature of dangerousness, the consensus view, whether legislatures routinely think of this circumstance as being dangerous, the breadth of the law, and other factors along those lines. But if the principle has not yet been established, what do I do as a legislator? So I think if there is no relevant principle that a law would slot into, like sensitive place regulation or dangerous person regulation, then you would conduct the Bruin analysis in order to help try to identify those principles of the Constitution that define the scope of the Second Amendment right. But it wouldn't just be a hunt for a particular precise historical analog. I think that that's really a caricature of Bruin, and that would make the Second Amendment a true outlier because there's no constitutional right that's dictated exclusively by whether there happened to be a parallel law on the books in 1791. Thank you. Thank you, Counsel. Mr. Wright. Thank you, Mr. Chief Justice, and may it please the Court. My friend has described several times the government's principle that in this case they are not relying on any analogs that were directed at people who were not part of the people outside the community, the national or political community entirely. That means loyalist laws are entirely off the analogical spectrum here because loyalists were also pervasively deprived of all of the rights of the people and citizenship they were enemies. The government said so in its Bruin amicus brief. In response to Justice Gorsuch's question about how the courts of appeals handle the issue of self-defense, necessity, duress, we cite a case on page 11 of our brief, United States v. Penn. I remember that case very well. It will show you how they handle it. There's effectively not one, I mean, even brief fleeting possession that lasts a little bit longer while being chased by people, not enough. So there is no real keeping for self-defense exception to this principle. And in regards to, I think it was Justice Alito's question of duration of protective orders, by default they can be permanent in Alabama, Colorado, Montana, Washington. No specific limit in Florida, Michigan, North Dakota, Vermont. Ten years in Arkansas. Five years in California, Ohio, South Dakota. And in Texas, where the default is two years, if the judge finds or a finding is made that felony violence was committed, it can be five years and the time is told. For instance, when someone's in jail. And so while it may be the case that if we counted noses exactly 51 or 52 or around a year or so, it is not the case that they are short. Now, the danger with any kind of historical inquiry is like the person looking down a well. So it feels like what the government is doing is looking down the dark well of American history and seeing only a reflection of itself in the 20th and 21st century and saying that's what history shows. When Congress enacted Section 922 G.A. in 1994, it acted without the benefit of Heller, McDonald, and Bruin, so we shouldn't be surprised that they missed the mark. They made a one-sided proceeding that is short, a complete proxy for a total denial of a fundamental and individual constitutional right. At this time, I would welcome questions from the Court. Counsel, would you take a bit of your time to recount exactly what happened below in this case, not in the district court, but in state court? So what happened in state court, we know very little about for certain. We have the order, which was attached as an exhibit to the federal complaint. And the order reflects certain findings. We have shown that those findings are incredibly common in this one county in Texas. But if you did an electronic search of appellate cases in Texas with the words credible threat and physical safety, I think you would only find three unpublished appellate cases all from this county. So there are words in it, but it wasn't a disputed type of finding. It was an agreed order. So my client, who was unrepresented, and a district attorney, a Tarrant County assistant district attorney, entered into a stipulation. The order was entered. The language was in the order. It's in the joint appendix. You can read it. And that's it. Now, I believe that, Justice Thomas, more happened. We could figure out what happened if we pulled out the records. But those aren't relevant. What happens in the civil proceedings doesn't matter for purposes of 922-GA. Well, I think what does matter is we're assuming dangerousness or irresponsibility, take your pick. And we have a very thin record, and I'm trying to get a sense of what actually happened in this case. So there are allegations that were taken in the federal pre-sentence report, and those are the ones that made their way into the opinion below. And if I could then distinguish between the facts that the court found for purposes of fixing a sentence in this case and the facts that could be contested at a jury, the facts that are the subject of the guilty plea, the ones that are essential to the conviction. In terms of the former category, there was a finding that there was a physical assault, that someone had attempted to intervene, and that Mr. Rahimi had fired a gun into the air at that time. And there are pending charges right now in Tarrant County for three misdemeanor offenses that are the same allegations. So the federal pre-sentence report found that those actions preceded and were the cause for the protective order. You sure? Counsel, you mentioned the self-defense, duress, necessity concerns in your opening. But this is a facial challenge, right? So we have to ask, is it unconstitutional in any application? And that would include cases where those circumstances don't exist. We don't have to address those in this case, do we? Your Honor, I think you do have to address them because the existence of such a defense is part of the crime, the definition of the crime. And so if, as the lower courts have consistently held, there either is no such defense or it is hen's tooth rare, then that plays into— Hen's tooth rare. I haven't heard that in a while. I like that. That plays into the facial analysis of the statute. And I think one of the areas we diverge with, my friend, is this facial versus as-applied distinction, which even this court, I was happy to read, finds that distinction amorphous sometimes. I certainly do. But in this case, by a facial challenge, we mean the elements specifically target conduct that is explicitly protected by the plain text of the second amendment. And if I were to disagree with you on that, though, there would be an as-applied challenge available later in those cases, right? An as-applied challenge—well, if you were to disagree with me, yes, that's correct. And the same thing when it comes to temporary dispossession. I understand your concern about permanent dispossession. But again, that isn't what's necessarily before us in a facial challenge. What we have to ask is, is it unconstitutional in all of its applications, right? Your Honor, that test for faciality, I think, is primarily remedial. It typically comes up in the civil context where someone is suing to enjoin the enforcement of a statute. And so the Salerno test comes into play as to— typically that assumes there is a valid application or a space of valid application of the statutes. And then the complaint is either there's too much outside or my case is outside or something like that. Ours is a facial challenge in the way that Lopez was a facial challenge, where the facts of Lopez were clearly within Congress's power under the Commerce Clause. This court found the facts of that case were, Person A was going to pay Lopez $40 to give that gun to Person C after school. That's within the Commerce Power, but the statute itself was not within Congress's power to enact. And so that statute failed as it then existed, the pre-amendment version of the Gun-Free School Zones Act, on its face. I just wanted to go back to your conversation with Justice Thomas. And I guess this touches on what you just said to Justice Gorsuch about the thinness of the proceeding in state court. She did submit a sworn affidavit giving quite a lot of detail about the various threats, right? So it's not like he just showed up and the judge said, credible finding of violence. So, Justice Barrett, I know that to be true, and I've personally looked at it, that's correct, and it's a matter of public record that you can see that. I've got it. Right. And I don't mean to suggest that. I mean that in terms of what was necessary for the federal prosecution, so what we could have defended this case on if it went to the jury, the federal jury, I mean, for the criminal prosecution. What happened before, whether it was good or bad, doesn't matter under the statute. And we take that as a given from this court's decision in Lewis, where there's sort of a conceded constitutional problem with the underlying felony prosecution. You haven't raised a due process challenge to the underlying felony prosecution either, right? The Second Amendment challenge, strictly speaking. That's correct, Your Honor, and we take that from Lewis. Lewis says what Congress intended when it passed the Gun Control Act in 1968 was those matters are off the table. So in Lewis, there's no doubt there is a constitutional violation  However, there is no Fifth Amendment claim against the felon in possession prosecution, even if the underlying felony is concededly unlawful and unconstitutional. So we take that as a given when we come to a statute like this, that even if we could show a due process issue with respect to the issuance of the protective order, that would be no defense against the federal prosecution. But if I'm wrong about that, I'm happy to hear it.  I'm sorry? You're right, Justice Gorsuch, and that gets to a really important point here. Because Congress has made this sort of a per se, automatic disarmament, and it has tied it to the issuance of a protective order, there is no due process required before a court enters an order in joining me from committing physical abuse against someone else. That is not a protected right. So what we have is a proceeding that's designed to adjudicate small rights or no rights at all, and then based on the results of that proceeding, and even the findings that are entered in that proceeding, we take very consequential actions that go against an individual's fundamental right to keep arms, citizenship. So I do not believe, at least I'm not aware of any due process that would apply with respect to the part of the order that 922 G-8 cares about, the one that says you cannot abuse that person. And so in that sense, there's no due process claim we could raise. So that's the thing. Congress has taken a big right to the Second Amendment. You're not saying that before a protective order is entered, there's no due process rights that an individual has, are you? I mean, is that the position you really want to take? For a G-8 order, so an order that forbids further abuse. I'm talking about in state court. Right, right. You're saying there's no, the due process clause is silent before a protective order can be entered against an individual? To the extent that the only remedy granted by that order is forbidding abuse, forbidding physical abuse. I don't think that you have any right to due process before that is entered, because you have no right to abuse anyone. It's just not. The infinites. You have no right to murder someone, but we give you a trial. Right. And so there's always process before a right or a life, liberty, or property is taken from you of some kind. What measure of due process depends upon facts, Arkansas, but we're not, I'm not talking about that. I'm surprised to hear you say that the Fifth and the Fourteenth Amendment's due process clauses don't apply to an individual who is being subject to a protective order. I think depending on what the protective order required. So those probably do kick in. In the same way that if this were a true disarmament proceeding. So this court, I don't think, has announced the criteria that would be required in something like a red flag law, but something like that. So everyone's attention is focused on the loss of firearm rights. There would be certain requirements and we could argue about it. I would submit it would probably need to be clear and convincing evidence, but it would certainly need to be fundamentally fair because this is a fundamental right. That's not what any state does for civil protective order. There's typically no incentive and often no real opportunity to contest the issuance of the order. And in many cases, people are happy to consent to the orders because they don't want to be around the person anymore. I just want to clarify. You're right. You don't have the right to commit violence against anyone. But this protective order says a whole lot more than that. I mean, he's prohibited from communicating with this family with going within 200 yards of her residence. So I think that paints a little bit of a different picture and the due process rights that might apply. I agree, Your Honor, that the due process clause would impose limits against involuntary termination of access to one's children, for instance. So I don't mean to suggest, and Justice Gorsuch, if that's what I implied, I didn't mean to. I don't mean to suggest that the due process clause doesn't matter what happens in one of these proceedings. Mr. Wright, may I ask just about your basic argument here? And I'm just going to read you a sentence from the brief, and I want to know whether that's your essential argument. It says, the government has yet to find even a single American jurisdiction that adopted a similar ban while the founding generation walked the earth. So is that what we should be looking for? And if we don't find that similar ban, we say that the government has no right to do anything? Your Honor, I think that's largely what Bruin says. However, I don't think it has to be so narrow. So if the government could affirmatively prove from the historical tradition of either American firearms laws, or even I would be willing to spot them the way that we have treated other fundamental constitutionally protected rights. If they could tie it to one of those historical traditions, that would be good enough under the logic of Bruin, if not the exact rule of decision. I'm not quite sure what the answer means. I mean, I took that sentence to be saying we're looking for a regulation that, even if it's not every jot and tittle, is essentially targeting the same kind of conduct as the regulation under review. And, you know, the Solicitor General told us that was the wrong approach, that what Bruin really directs courts to do is to think about the various principles that were operating at that time, and whether those principles gave rise to a particular regulation that was near identical to the one under review. And so I guess I'm asking you to comment on those two ways of understanding Bruin. I think both methodological positions lead to the same result, which is affirmance of the decision below. It's not just something that is about domestic violence, or a ban is punishable by exactly ten years. In other words, that's the way that some of the amici have described what we're arguing for. I'm saying there's no ban. There's no history of bans for people who are part of the national community. They don't exist. I'm saying that the plain text of the Second Amendment, the way that it distinguished from the English common law tradition, I'm saying that the early commentators like St. George Tucker and William Rawls, they all said if you're just keeping the fire alive. But that does suggest, I mean, that you're looking for a ban on domestic violence. And, you know, 200 some years ago, the problem of domestic violence was conceived very differently. People had a different understanding of the harm. People had a different understanding of the right of government to try to prevent the harm. People had different understandings with respect to pretty much every aspect of the problem. So if you're looking for a ban on domestic violence, it's not going to be there. Justice Kagan, I'm looking for a ban. I'm looking for a ban. A criminal punishment for just the keeping of a firearm. That's what I'm looking for. And it's based not on the loss of status of citizenship or being outside the community. I'm looking for a ban that applies to a rights-holding American citizen. I mean, I'd start with that. Short of that, again, and I suspect the response to that is this court has tentatively approved felon in possession. But felons are so different. They hit all kinds of process. There's a long tradition of denying people convicted of infamous crimes all manner of rights of citizenship or not. So if I could just set that aside, there's no ban. Because at the time, when the people of the time actually wrote about it, they wrote that there's no right to misuse a firearm. So the allegations that are made against my client, we do not contend that behavior is protected by the Second Amendment. The behavior that's protected is the keeping of arms. The behavior that is also protected is the carrying of arms. But I would concede there is a strong historical tradition of providing more restrictions against the right to public carry. Because that's where you encounter other people. This is someone who is keeping a firearm in his own home. The oldest American tradition, at least of a federal government, someone who everyone agreed was subject to the Second Amendment, passing that kind of law, was 1968. This tie is older than that so-called tradition, Your Honor. It's 20th century, late 20th century. And so we disagree at a very fundamental level of whether there is this tradition. So your argument is that, except for someone who has been convicted of a felony, a person may not be prohibited from possessing a firearm in the home. Is that correct? I would add one more caveat to it, Justice Alito. And that is if severe criminal punishment will result. Because that is something that Heller itself and Bruin itself took into this balance. Because the right that's protected is the right of someone who, by keeping the firearm, for lawful purposes, how does this regulation infringe on that? If it is a small fine or even loss of the weapon, maybe that doesn't violate that right. You could make it illegal. You're prohibited from keeping a weapon. But if we figured out that you had a weapon in your bedroom, you may have to pay for it. But you're not going to go to prison for 10 or 15 years. You're not going to get felony liability. I think all of those things together are incredibly important about this ban. Because they are. It is not based on loss of rights of citizenship. It is applied against rights holders. It is a total ban. And it is punishable by an incredible amount of prison time. So let me give you this example. Suppose a state judge determines after a hearing that a man has repeatedly threatened to shoot the members of his family, has brandished the gun, has terrified them, and orders the man not to enter a restraining order, preventing that man from possessing a firearm any place, including in the home. Is that constitutional? I think the answer is probably yes. I think it probably is. I would want to know more about what the historical tradition showed. But certainly courts have always had broad power against the people who are brought before them. And I think that would be consistent with the historical tradition. So the difference you see between that order and the prosecution for violating the order is the fact that the latter imposes a felony punishment. That's one difference. And it's an important difference under this court's case law. Another difference is that the defendant had a real opportunity in standing before the court to say either, number one, I didn't do that, or number two, something was wrong with me. I'll never do that again. And I'll move across the country so I can assure you that they will be safe. But I'm very frightened to be without my arms. So you would have a chance to entreat with the person who's putting in the restriction. If the restriction itself was unlawful, the person would have a chance to appeal it to a higher authority, to an appellate court, and say this judge got it wrong. You know, this is not lawful either under the Constitution or under this state's substantive law. All of those things are different in the situation that you described. And I think they are constitutionally significant differences between that and what we have here. So are you suggesting if there's a sufficient showing of dangerousness, that can be the basis for disarming, even with respect to possession in the home? Again, it's a much closer question for me because I have yet to see a historical example of that applied against a citizen. And it would certainly be a last resort type of situation. Well, to the extent that's pertinent, you don't have any doubt that your client's a dangerous person, do you? Your Honor, I would want to know what dangerous person means at the moment. Someone who's shooting, you know, at people, that's a good start. So, if that's fair, I'll say this. Imagine a statute that had been written that was the what-Zachary Rahimi-has-been-accused-of statute. And very prescient legislators, you know, way ahead of the game. If you've done all of these nine things, and it's proven to a constitutionally significant level of abstraction, you don't get to keep your gun. We're going to come and take it from you. And you just, sorry, you just don't. Constitutional, 100%. I thought you just said no. I thought you said there's no history of any kind of ban for anything that doesn't relate to felonies. And I want to be clear that there is no one that I've found anyway. I think it would stem from a court's either historical equitable powers or, you know, the rights of the government to literally protect someone from imminent danger to life and limb. There are examples, some of the early Justice of the Peace manuals that talk about if you see someone who is on the way to commit a crime with a weapon, you can take the weapon away from them. And you don't have to institute proceedings immediately. However, you do have to institute them pretty quick after that. I'm so confused because I thought your argument was that there was no history or tradition, as Justice Kagan just said, of this kind of disarmament in this circumstance. But now it kind of sounds like your objection is just to the process. Are you making Judge Ho's argument only? No, Your Honor. I'm not making Judge Ho's argument only. The law that's before us right now is a ban. It's a ban that's passed by a legislature, and it is, you can't get around it. You can't even ask the state court to say, you know, I will accept a protection order, a stay-away order, just give me permission to keep firearms for my own self-defense. That will not prevent this ban from kicking in, and it has severe penalties that result from it, and it applies everywhere, even in the home. I think all of those things together make this statute unconstitutional. I understood the question to be, what about something else? Would that be constitutional? And I think so. But we would need to know, we do need to do a full workup on the history and tradition that supported that. You know, that's something that I don't think this court can answer in this case because there's no such law before the court. Well, but it's a facial challenge, and I understand your answer to say that there will be circumstances where someone could be shown to be sufficiently dangerous that the firearm can be taken from him. Yes. And why isn't that the end of the case? All you need to do is show that there are circumstances in which the statute can be constitutionally applied. Because this statute, it doesn't take anyone's firearm from them. I mean, that's one way that it would be different, because there is a historical tradition of separating people from their firearms when there's an imminent threat of lawful violence on the way to do it. And I think, again, it's consistent with the court's traditional equitable powers that if nothing short of surrender would protect life and limb, the court's going to be able to order surrender in the same way that if the police see that someone has, you know, suicidal, they have reason to believe they're suicidal, of course the police can go and take the firearm away from them. They can't keep it forever, and they can't put somebody in prison for 10 years because he had the firearm there. So I hear you isolating bans by the legislature as opposed to circumstances in which a court might have particular facts in this way. Is that what you're doing? You're sort of saying bans by the legislature are a different thing than we have facts of imminent potential danger and someone runs to the court. There might be a history and tradition of that, but you see that as different than a ban by the legislature, such as what is happening here. Yes. All right. So I guess I'm just trying to understand, maybe this is an aside, but your brief does indicate that you are aware of historical bans, laws banning firearm possession by disfavored categories of people. And the government talks about this as well. And so do you agree with the government that those kinds of bans we don't look at or care about when we're trying to figure out whether or not there's history and tradition here? Yes. And I don't want to speak for my friend. I understood the government's position to be we don't look at those laws in this case. It sounds like they may still be on the table for some other person who's outside the political community. I said you don't look at them at all because, number one, they're awful. They're terrible laws. We should not give credence to a suggestion that a legislator in 1870 in the South, you know, so we should not. But we have a history and traditions test. I guess I'm a little troubled by having a history and traditions test that also requires some sort of culling of the history so that only certain people's history counts. So what do we do with that? Isn't that a flaw with respect to the test? Your Honor, I think what you do is the Bruin test starts with the text. And so ultimately historical tradition, as I understand it, is something the court does to make sure its textual interpretation is correct and consistent with the original understanding of the amendment. So in the situation that you're describing, those laws, they were not people who were part of the community. They weren't seen as the people. And when these laws were challenged, including in this very court, that was the reason. This court was not dealing with a disarmament law, but other laws that were targeted those groups. So does that mean only reconstruction era as opposed to, I'm sorry, only foundational era as opposed to reconstruction era sources are on the table here? For purposes of the Second Amendment and applied against the federal government, yes, absolutely. It is only founding era sources and immediately after the founding era. So people who understood they were bound by that. Like, again, I don't see these two steps of Bruin as completely separate pieces. You know, you pass the text point and you move on. The court is trying to get at the meaning of the text, the original public meaning of the text. And in your view, with respect to domestic violence, are we looking for history and tradition in the reconstruction era about how regulation was happening in the circumstance of domestic violence or no? I mean, the government says it can be done at the level of regulation of dangerous people with respect to firearms. But you seem to be suggesting, and I think this is going back to a question that Justice Kagan asked, that what we're looking for is reconstruction era sources. I suppose that applied to the regulation of white Protestant men related to domestic violence. Is that sort of the level that we are focused on when we're trying to find a history and tradition? No, Your Honor. I may not have been clear before. I think it's the founding era, not the reconstruction era. When we're talking about the founding era. I apologize. The founding era. And it has got to be the people. Someone who would have been understood to be part of the people. A right-holding citizen. Right. The people doing what, though? Do we drill down further and say it's the people, which in that case did not include all the people, but fine. We've identified the relevant people who are being regulated. Is it enough that they were being regulated with respect to just dangerousness, or are we looking for a regulation concerning this set of circumstances? It doesn't have to be specific to domestic violence. I'm not saying that. Violence. Interpersonal violence. Dueling. Robbery. So, in other words, society understood violence, understood dangerous people. Danger existed, but they rejected at every point the type of dangerousness disarmament principle that the government is advocating. Do you think that Congress can disarm people who are mentally ill, who have been committed to mental institutions? Setting aside an enumerated powers problem, so they're in the District of Columbia or something like that. There's definitely a tradition for restricting sale or provision of weapons to the mentally ill. All the examples that the government has cited are late. They're post-Civil War sources, I think, for that. If not, so I think maybe is the answer to that tradition. I'll tell you the honest truth, Mr. Wright. I feel like you're running away from your argument. Because the implications of your argument are just so untenable that you have to say, no, that's not really my argument. I mean, it just seems to me that your argument applies to a wide variety of disarming actions, bans, what have you, that we take for granted now because it's so obvious that people who have guns pose a great danger to others and you don't give guns to people who have the kind of history of domestic violence that your client has or to the mentally ill or what have you. So I guess I'm asking you to clarify your argument because you seem to be running away from it because you can't stand what the consequences of it are. Your Honor, I am running away from interest balancing because I understand that that same sort of argument could have been made in Bruin, could have been made in Heller, could have been made in McDonald, and in fact were made in all of those cases. Legislators have made a judgment that it is dangerous to have people carrying weapons about. Legislators have made a judgment it's dangerous for handguns specifically to be possessed. And the court didn't defer to those late or mid-20th century judgments or even early 20th century judgments about dangerousness in that scenario. Instead, the court said we are going to follow our understanding of the original public meaning of the text and as illuminated by the historical tradition of firearms regulation at the margins. So I guess that's what I want to say is that if there's no such tradition, so if you couldn't, I'm supposing that we would find examples of people having firearms removed from them if they are an imminent danger to others. That historical record has not been built in this case because that's not the kind of law that we have. I do believe that it's there and I could give some additional examples where I think we could find support for that. But if not, if there were no historical support for that, we would be left with what the text says, which is you have a right to keep arms. And so in that sense, that would end. Thank you, Counsel. Justice Thomas, anything further? Briefly, just to be clear what you're arguing, you say that the proceedings in state court, let's assume that there was no 922 consequence. What would be the effect of that order? You would not be challenging that order? Well, I wouldn't be challenging the order, but Mr. Rahimi might. My question, the reason I'm asking you that, you made the point that that was a small matter and it has huge consequences. I think you said that even if a respondent moved to another state or across the country, the consequences would be the same, even though he would present no danger in Texas. And just to be clear, you're not challenging the state court aspect of this? That's correct, Your Honor. But solely, in your language, it was a per se violation or automatic violation of 922, and that is your problem? The possession of firearms is the bootstrapping of what is a proceeding that is one-sided and does not have any kind of historical connection to the loss of citizenship rights. Bootstrapping that is like a conclusive presumption to a right that the federal constitution guarantees against Congress. So there was some talk about possibly challenging this under the due process clause later on or as applied challenge to this. How would you see that taking place if this is an automatic disarmament? I will be interested to read how it would proceed. My understanding is that you can't raise it in a 922G prosecution. I base that on Lewis and on what we understand Congress's intent to be in enacting these categorical bans. If you have this kind of order, then you lose. So I think 922G8 plays a role in that sense. And if the issue is that you have tied a larger constitutional right to sort of a smaller right, it's not clear what imposes that due process clause. And so I think that this was an agreed order because he doesn't have counsel, he doesn't have the ability to do it, and he is ultimately willing, I guess, to submit maybe to avoid the attorney's fees, which is a way that they apparently get people to agree to these orders. That would not be a fundamentally fair system if it were a red flag or a disarmament provision. Justice Alito? Justice Sotomayor? Justice Kagan? Justice Gorsuch? One specific thing in the government's reply brief that I want to get your response to. Page 21 of the reply brief, the government notes the background check system that Congress has created to prevent the sale of firearms to prohibited persons. Domestic violence protective orders are promptly incorporated into that system. It's resulted in more than 75,000 denials, the government says, based on these protective orders in the last 25 years. According to the government, under your argument, that system can no longer stop persons subject to those domestic violence protective orders from buying firearms. I just want to get your response to that. I think that's wrong for a couple of reasons, Justice Kavanaugh. First of all, the same system incorporates state prohibitions against firearm possession, and so if there is a lawful provision imposed by state law or by a judge in court, it could be incorporated into the background check system. Second, I would have to concede that there is a historical tradition of limiting who citizens, people within the community, could provide weapons to outside the community, if you will, and so it could be that that historical tradition would support a restriction on commercial sale of arms. That's an example that Eller gave as one that maybe has a different framework. So that's an argument that could be made in favor of that sort of provision or sort of background check process that would not go away with 922G8. And just as a highly technical matter, I understand that to be a function of 922D8, which, again, is restricting what the licensed firearms dealer can do, not G8, which is the restriction on possession by the citizen. This is what my client was prisoned for. But on the other hand, if you have a right to possess a firearm, then certainly the acquisition of a firearm is closely connected to that, and constitutional implications would come into play. So I just don't have a firm view on whether or not a law that operated more like some of the earliest 20th century laws that sort of dealt with acquisition of firearms, that might survive constitutional scrutiny. So it's possible the government's correct in what it says? It's possible. No, I don't think it's possible. It is possible that it would be unconstitutional to deny people the right to purchase a firearm from a licensed dealer. Yes, I think that is possible. But I suspect that both existing law and constitutional laws would allow many of those same people to be denied if we worked our way through the relevant provisions that are keeping them from doing it. Okay. Thank you. Justice Barrett? So if the restraining order prevented your client from possessing a firearm and it also immediately suspended his handgun license, was that unconstitutional? Your Honor, just to take issue with the second part of the question first, that language, suspending handgun license, that's in all of these Tarrant County orders. That's part of the boilerplate. But still it says it's ordered that his handgun license is immediately suspended. Right. So let's go with the orders language. Did that violate the Second Amendment, putting 922 aside? I think to answer that question, then we would bring the whole record, the record that was before the court in terms, and the client agreed to the order. So it would be very difficult. But you're going back to the process. Right. You know, she had the affidavit. Let's imagine they go back and forth. Let's imagine it's a more fulsome process and she actually testifies and he cross-examines her. Whatever. Let's assume there's no process problem. Would it be unconstitutional then to deprive your client of his handgun license and prohibit him from possessing a firearm? Because I assume that you said there's no analog of this kind of domestic violence. Right. The analog would be in terms of what courts could do through equitable powers. Otherwise, I think that would have to be the analog. But they can't, through their equitable powers, do something that would violate the Constitution, right? Right. Right. So if the finding was that nothing short of surrender of firearms would prevent damage to life and limb, that would be constitutional. So I don't know if that answers your question or not. Justice Jackson? I guess I'm just trying to get a clear answer to whether or not we're looking for historical analogs related to domestic violence or something broader. You suggested in your brief I'm now revisiting suggests that the government cites no laws punishing members of the American political community for possessing firearms in their own homes based on dangerousness, irresponsibility, crime prevention, violent history, or any other character trait. So you just say there are no bans that relate to any of those things. That's my understanding of the historical record that we have in this case. And if the government were to convince us that there was a ban related to, say, dangerousness, do you lose? I thought your point was even if there is some dangerousness tradition, it has to be about domestic violence. That's not my point, Your Honor. Okay. That's not something that we're – people could argue that, but I don't think anybody, none of our amici have argued that. Certainly there's some point at which someone can be separated from a firearm. This law doesn't do that at all for anyone. This is just can you be punished for keeping a firearm. And I think that the text of the Constitution says no. The early commentators would say no, at least as far as Congress doing it. And the historical tradition all say no. So in terms of the level of abstraction, I don't see how this case presents that because there's just nothing – no bans, no bans against rights holders. Thank you. Thank you, Counsel. Thank you. Rebuttal, General? Thank you, Mr. Chief Justice. My friend began his argument this morning in response to a question from Justice Kagan saying that he does read Bruin to require the government to come forward with a precise historical analog in order to justify a modern-day firearms regulation. I think that it's a clearly incorrect reading of Bruin. Unfortunately, it's a profound misreading that many lower courts have been adopting, and I think that it's important for the court to understand the destabilizing consequences of that reading in the lower courts. Just last week, a court invalidated Section 922G1, the Felon Prohibition Statute, on its face as applied to the most violent and horrific crimes imaginable on the theory that the government didn't have a sufficiently precise historical analog to justify a permanent ban on felons. Many courts now, several district courts, have credited as-applied challenges to Section 922G1 by armed career criminals who have multiple convictions for aggravated assault, drug trafficking, armed robbery, clearly violent crimes, because we don't have a sufficient historical analog disarming those subject to precisely those crimes at the founding. And a court has also invalidated on its face the provision of federal law that prohibits possession of firearms with obliterated serial numbers, again on the theory that we don't have a founding-era analog that is sufficiently precise that says you have to serialize firearms possession. I think that those are clearly untenable results. They are profoundly destabilizing, and Bruin doesn't require them. Once the court corrects the misinterpretation of Bruin, then I think the constitutional principle is clear. You can disarm dangerous persons. And under that principle, Section 922G8 is an easy case. It's an easy case for three reasons. First, it requires an individualized finding of dangerousness. Now, I think I heard my friend concede today that those kinds of individualized findings of dangerousness do suffice for disarmament, and he questions whether the process in state court judicial proceedings is sufficient. But that ultimately is a procedural claim that should be adjudicated under the Due Process Clause, and I think that it ignores two fundamental features that are relevant here. First, the Section 922G8 guarantees notice in a hearing. It only permits disarmament in those situations, so the most fundamental protection of due process is validated under this provision. And second, that there is a presumption of regularity that exists in this context, and to say or suggest that all of these state courts' procedural orders, protective orders, are fundamentally flawed or inherently unreliable, I think would override that presumption in this case and be profoundly unsettling for the state courts that are on the front lines here trying to protect victims of domestic violence. I think as well that these principles equally demonstrate subparagraph C2's validity. We think that there is an inherent requirement that the court find that the threat of physical force is likely to occur in order to justify entering that kind of judicial finding, and that provides a basis to uphold Section 922G8 with respect to all of its applications. The second reason why this is an easy case is because there is a legislative consensus. It is not just Congress, but 48 states and territories share this view that armed domestic violence needs to be guarded against and that disarmament is a permissible legislative response, and so I think that further fortifies the congressional judgment. And the third reason why Section 922G8 should be an easy case is because it does guard against a profound harm. A woman who lives in a house with a domestic abuser  and it's not just the harms in the home. It extends to the public and to police officers as well. I was struck by the data showing that that domestic violence calls are the most dangerous type of call for a police officer to respond to in this country, and for those officers who die in the line of duty, virtually all of them are murdered with handguns. Section 922G8 takes account of those concerns, and here history and tradition confirm common sense. Congress can disarm armed domestic abusers in light of those profound concerns, so we'd ask the Court to correct the Fifth Circuit's methodological errors and reverse. Thank you, Counsel. The case is submitted.